Walter M. Matthews et al., as Trustees, Plaintiffs, *v.* Jeremiah Burns, Inc., et al., Defendants.

Supreme Court, Special Term, New York County, March 31, 1954.

*Harry N. French* and *Francis X. Conway* for plaintiffs.

*M. Carl Levin* and *Albert Foreman* for defendants.

IsIDOR WASSERVOGEL, Special Referee. Plaintiffs, as trustees of an employer-union welfare fund established pursuant to an agreement dated May 2, 1946, seek to recover damages for the alleged breach by defendants of the terms and provisions of such agreement, as amended.

On or about February 11, 1946, the Building Trades Employers' Association of the City of New York (hereinafter referred to as the "Association") and the Building and Construction Trades Council of Greater New York and Long Island (hereinafter referred to as the "Union") entered into an agreement known as the "Master Agreement," pursuant to which there was thereafter established a welfare fund for the benefit of Union member-employees. The fund was created by an agreement and declaration of trust on or about May 2, 1946, and is administered by representatives of both the Association and the Union. Pursuant to this trust agreement (hereinafter referred to as the "Original Agreement") employers of men belonging to the union were required to pay a 3% tax on their payroll, which was collected by the trustees and set aside for welfare and disability benefits. On or about May 11, 1949, the original agreement was amended by a new declaration of trust (hereinafter referred to as the "Amended Agreement"). The

dispute between the parties arises as a result of this amended agreement. Plaintiffs claim that this amended agreement, by its own terms, was made retroactive to May 2, 1946, and reaffirmed the employers' obligation to pay 3% on the wages of all employees doing the work of metal lathers, including foremen and so-called "permit men." Defendants contend, however, that the amended agreement was not to become effective until on or after the date of its execution, May 11, 1949, that the 3% payroll tax did not apply to overtime wages, and that the salaries of foremen and permit men were not within the intendment of such agreement. Thus, it is necessary for the court to examine the master agreement, the original agreement, and the amended agreement in order to determine whether defendants must contribute, *retroactively to May 2, 1946,* a 3% payroll tax on *both* regular and overtime wages of *all* metal lathers employed by members of the Association, including foremen and permit men.

Examination of relevant provisions of the master agreement, the original agreement, and the amended agreement clearly establishes that both regular and overtime wages of *all* employees who performed work of metal lathers were intended to come and do come within the meaning of the terms "employee," "payroll" and "gross wages," as these terms now appear and are used in the amended agreement here involved. The term "gross wages" patently includes moneys paid for overtime work. Moreover, by express provision, the 3% payroll tax is imposed on the "*entire payroll* of the metal lather industry," which phrase necessarily includes *all funds* paid by employers to metal lathers on account of wages. Likewise, both the master agreement and the original agreement provide "for an *industry-wide payroll* tax of three per cent * * * commencing with the payroll beginning May 2, 1946." In the opinion of the court, these provisions are clear and unambiguous and were intended to cover all wages received by metal lathers engaged in work performed by members of the Union.

There is no merit to defendants' argument that the provisions in the master agreement which grant to each trade the alternative of paid holidays or welfare benefits preclude the collection of the 3% employer contributions due on foremen's wages. The alternative provisions relied upon by defendants applied to all of the many building trades which were parties to the master agreement, such as carpenters, cement masons, and lathers, and gave each trade the right to elect to take paid holidays or estab-

lish a welfare fund. The metal lathers here involved elected to establish a welfare fund. The record establishes that although such fund was originally set up for the sole benefit of members of the union, *which included foremen,* in February, 1948, in order to comply with the requirements of the Taft-Hartley Law, such benefits were made available to all employees, including foremen and permit men. It is to be noted that a specific provision of the amended agreement, as hereinafter more fully discussed, made all of its terms and conditions retroactive to May 2, 1946. Nothing set forth in such agreement excluded foremen from the benefit of this retroactive provision, nor is there any other provision therein which warrants the interpretation that *any* of the wages theretofore received by such employees were not to be included for purposes of computing the 3% employers' contribution to the welfare fund.

It is evident from the language of the agreements that no distinction was made between the regular wages and overtime wages, between wages of members of the Union and wages of permit men, or between wages of journeymen and wages of foremen. There is nothing in any of the agreements from which the court can infer that any such distinction was intended. If the parties desired to place foremen and permit men on a different basis, or if the parties desired to exclude overtime wages or part of any wages from the tax or retroactive provisions imposed by the terms of the amended agreement, they could have and should have so provided. The court may not now, by judicial determination, in effect, add to the provisions of an unambiguous contract.

Moreover, the amendments to the original agreement controvert defendants' contentions that the 3% payroll tax was intended to apply only to regular wages of regular union men and that foremen and permit men were not to be included within the purview of such amended agreement. The term "employee" is defined in the amended agreement as follows: "The term 'Employee,' as used herein shall mean all of the members of the Union employed by Employers *and all other persons employed by the Employers who shall perform work regularly performed by members of the Union.*" (Italics supplied.) There can be no doubt that this definition, as adopted by the parties to the agreement, is broad enough to include within its meaning both permit men and foremen, all of whom necessarily are engaged in work "regularly performed by members of the union," within the meaning of the aforesaid definition. The

mere fact that the original agreement, by its terms, may have restricted welfare benefits to members of the union only is not inconsistent with the employers' present obligation under the terms of the amended agreement to contribute a tax based on *all* wages of *all* employees performing the work of metal lathers. It is to be noted that when the parties amended the original trust agreement, they adopted the following recital clause: " WHEREAS, among other things said agreements provided, provide or contemplate that commencing with the payroll week beginning May 2nd, 1946 and monthly thereafter during the term of said agreements, every Employer, whether members of the said Associations or otherwise, shall pay to the Trustees herein mentioned a sum equal to three per cent (3%) of the *gross wages payable to Employees* for such period preceding the date of such payment as the Trustees may determine; such payments are hereinafter called the ' Employers' Contributions ' and are to be for the sole benefit of the *Employees* and to be used to purchase insurance, hospitalization, medical and sick benefits &c. for *Employees,* their wives and their children under eighteen (18) years of age, as the Trustees may determine."

It is apparent from the foregoing that the term " employee " does not now restrict the benefits of the welfare fund solely to Union members, particularly in view of the adopted definition of such term (*supra*). As above noted, the original and master agreements may have contemplated such limitation. However, although all of the parties to the amended agreement may not have voluntarily desired to extend the benefits of the welfare fund to other employees, they nevertheless were compelled to do so by virtue of the enactment of the Labor-Management Act of 1947, commonly known as the " Taft-Hartley Law." In 1946, when the master and original agreements were executed, there was no provision of law such as now exists under this Federal law, which makes it mandatory that benefits payable by a welfare fund created as a result of a collective bargaining agreement be available *on an equal basis to all employees* on whose wages employer-contributions were paid, whether or not such employees are members of the labor union which was the bargaining representative (*Penello* v. *International Union, United Mine Workers of Amer.,* 88 F. Supp. 935, 939; *Jandel Furs,* 100 N. L. R. B. 1390). Thus, regardless of what may have been originally intended by the parties in 1946, it became an unfair labor practice under applicable Federal law to restrict beneficial participation in a welfare fund to members of a union. It does

not follow, therefore, as defendants contend, that the limitations set forth in the master and original agreements, which were executed prior to the enactment of the Taft-Hartley Law, now preclude any contribution by an employer, retroactive to May 2, 1946, based on the wages of employees other than union members. The obligation of paying a 3% tax based on the wages of *all employees* within the jurisdiction of the Union, concededly, was necessarily undertaken by the employers after Congress passed the applicable statute. Nonetheless, the employers, by virtue of their voluntary contract obligations, as set forth in the amended agreement, are now equally bound to make such payment retroactive to May 2, 1946, even though such effective date was agreed upon by the parties without any compulsory legislative mandate.

There is nothing in the record which warrants the conclusion that the amended agreement was not effective until on or after May 11, 1949, the date of its execution. On the contrary, it is evident from the terms of the agreement itself, that all of the provisions were intended to be and were in fact made retroactive to the date of the original agreement, to wit, May 2, 1946. The amended agreement specifically states that '' it is made and entered into *as of the 2nd day of May 1946* '' and before setting forth in full the context of the new trust indenture, it provides: '' IX. The Amended Agreement and Declaration of Trust shall, *from and after the date set forth therein,* be as follows: ' *Amended Agreement and Declaration of Trust* Agreement and Declaration of Trust *as of May 2nd, 1946* (as amended by Agreement *made and entered into as of the same date* ' '' (Italics supplied).

The concluding paragraph of the amended agreement further provides that the parties who have executed the amended agreement and declaration of trust agree '' *to be bound hereby as of the day and year first above written.*'' The only day and year '' above written,'' significantly, is May 2, 1946.

It is fundamental that where parties to an agreement expressly provide that a written contract be entered into '' as of '' an earlier date than that on which it was executed, the agreement is effective retroactively '' as of '' the earlier date and the parties are bound thereby accordingly (*Brewer* v. *National Surety Corp.,* 169 F. 2d 926, 928; *Forrest* v. *Mutual Benefit Life Ins. Co.,* 195 Misc. 12, 16-17, affd. 275 App. Div. 939).

The only date other than May 2, 1946, which appears in the amended agreement is May 11, 1949, with the figure '' 11 ''

inserted in ink. From its position on the instrument and from the language of the agreement itself, it is obvious that this date is intended to indicate the date of execution rather than the effective date of the instrument, as advocated by defendants. Accordingly, I hold that on or about May 11, 1949, the parties here involved agreed, in effect, that (1) " as of May 2, 1946 " employer contributions would be paid on " gross wages " of all employees performing metal lather work, whether or not members of the union and, in accordance with mandatory provisions of Federal law, that (2) welfare benefits should be provided for all such employees. The second provision became effective retroactively to May 2, 1946, just as did the first provision.

As heretofore noted, the term " gross wages " necessarily includes overtime wages. Likewise, foremen, as members of the union, must have their wages included in the wages of " employees " as defined in the amended agreement (*supra*). Permit men are nonunion laborers who are " licensed " by the union to perform work " regularly performed by members of the union " and thus are clearly included within the intendment of the amended agreement. Therefore, since the amended agreement effective as of May 2, 1946, required the payment of 3% employer contributions on " the gross wages payable to employees," who are defined as " all of the members of the union employed by employers and all other persons employed by the employers who shall perform work regularly performed by members of the union," (*supra*) it necessarily follows that employer contributions were due from May 2, 1946, on regular and overtime wages of all employees, including the wages of foremen and permit men.

In the opinion of the court, the provisions of the various agreements here involved are clear and unambiguous and require no extrinsic evidence for their interpretation. However, upon the trial of this action, the court, sitting without a jury, permitted defendants' witnesses to testify, over plaintiffs' objection thereto, as to purported oral agreements which, in effect, varied the terms of the written agreements. The court advised the parties that such evidence would be disregarded at the conclusion of the trial " if I think it should be disregarded." At the time such evidence was offered and accepted, the court was not aware of many of the essential facts which were adduced later in the trial. In attempting to construe the agreements here involved, therefore, it was the duty of the court to place itself in the situation of the parties, and from a consideration of the

surrounding circumstances, the occasion and apparent object of the parties, to determine the meaning and intent of the language employed. Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish (*Mecca Realty Co.* v. *Kellogg Toasted Corn Flakes Co.,* 166 App. Div. 74, 76; *Gillet* v. *Bank of America,* 160 N. Y. 549, 555-556; 2 Williston on Contracts, §§ 629-630). With these principles in mind, the court permitted defendants' witnesses to testify. It now appears, however, that such testimony, at best, is vague, indefinite, and contradictory. Likewise, it now appears that all of the alleged oral agreements and conversations testified to by these witnesses preceded the signing of the written amended agreement, the date of which was in dispute upon the trial of this action. It necessarily follows that everything, including these alleged conversations and oral agreements, was merged in the written instrument here involved. Under these circumstances, the court may not consider the testimony of these witnesses, inasmuch as such evidence would be in direct violation of the parol evidence rule (*Laskey* v. *Rubel Corp.,* 303 N. Y. 69; *Fogelson* v. *Rackfay Constr. Co.,* 300 N. Y. 334, 338-340). Such oral testimony, therefore, is disregarded by the court at this time.

Assuming, *arguendo,* however, that there is some ambiguity in the provisions of the various agreements under consideration, the court must then give due consideration to the relation of the parties as well as the circumstances under which the agreements were executed (*Atwater & Co.* v. *Panama R. R. Co.,* 246 N. Y. 519, 524; *Wilson* v. *Ford,* 209 N. Y. 186, 196). Likewise, where there is doubt as to the intent of a provision in a contract, the practical construction which the parties themselves give to the contract is a most significant factor in determining its meaning (*Brooklyn Pub. Lib.* v. *City of New York,* 250 N. Y. 495, 501; *Matter of Mencher* [*Geller & Sons*], 276 App. Div. 556, 565; *Matter of Alamac Restaurant* [Rubin], 203 Misc. 463, 465, affd. 281 App. Div. 1016). These principles, when applied to the instant action, further establish that defendants' contentions cannot be sustained. The record shows that in May, 1946, when the trust agreement was adopted creating the welfare fund, there were more permit men than there were members of the Union in good standing. In the opinion of the court, it is unlikely that under such circumstances the parties to an agreement which

established a welfare fund based upon " an *industry-wide* payroll tax of three per cent " intended to limit employer contributions to less than half of the metal lather industry's payroll and to have a particular employer's obligation depend solely upon the number of members of the Union in good standing which were in his employ. If this were the fact, an employer who might employ a large number of permit men on whose wages he would not be required to contribute to the welfare fund would have a very great competitive advantage over a contractor employing members of the Union. Such result, in the opinion of the court, was not the intention of the parties.

Moreover, after the creation of the welfare fund in 1946, a number of significant events occurred which conclusively establish that all parties to the agreement, including members of the Association, were aware that employer contributions were required to be paid on overtime as well as the regular wages of all metal lather employees, including permit men and foremen. In February, 1948, all such metal lathers, their wives and dependent children were specifically covered by group insurance to provide various welfare benefits. All contributing employers, except the seven defendants here involved, from the very inception of the welfare fund, *did pay* the 3% tax on both regular and overtime wages of *all* metal lathers employed by them. When the question was raised at meetings of the trustees on October 24th and October 30, 1951, it is significant to note that it was unanimously decided by the trustees, who include representatives of the employers' Association, that contributions were to be made on the basis of overtime wages. Thus, the trustees, who under the provisions of the agreement here involved had the authority and duty to administer the welfare fund, ruled, whenever the question came before them, that permit men, foremen, and overtime wages were within the intendment of such agreement. Great weight must be given by the court to the practical construction of the provisions of the contracts by the officials whose duty it is to administer them (*Matter of Kolb* v. *Holling*, 285 N. Y. 104, 112; *Bullock* v. *Cooley*, 225 N. Y. 566, 571).

Upon the evidence before me, and in view of the surrounding circumstances, the conduct of the parties and the trustees in interpreting and acting under the agreements here involved, I hold that employer contributions to the welfare fund are due from May 2, 1946, on the regular and overtime wages of all employees doing the work of metal lathers, including foremen and permit men.

Defendants have cited *Churchill* v. *Bailey* (13 Me. 64), *Lauder* v. *Peoria Agric. & Trotting Soc.* (71 Ill. App. 475) and *Hinson* v. *Noble,* (122 S. W. 2d 1082 [Tex.]) in support of the principle that where the date of *execution* or *delivery* of an instrument is in question, such date may be established even though it conflicts with a date set forth in the instrument. This principle, however, is not applicable here. In the instant action, there is no issue with respect to the date of the execution of the amended agreement. The sole question with respect to date is the *effective* date of the agreement here involved, and that is clearly and unambiguously set forth '' as of May 2, 1946.''

Judgment is rendered in favor of plaintiffs against each of the defendants for the amounts set forth in the stipulated statement of facts, with interest thereon. The counterclaim of the defendant Neff Lathing Company, Inc., is dismissed upon the merits.

Settle judgment in accordance with the foregoing, which constitutes the decision of the court, within ten days on three days' notice.

Defendants may have a thirty-day stay of execution.