### In re The MONETARY GROUP, Debtor.

### In re The SECURITIES GROUPS, Debtor.

### In re The SECURITIES GROUP 1980, Debtor.

### In re The SECURITIES GROUP, Debtor.

**Bankruptcy Nos. 84–428–BKC–3P1, 84–430–BKC–3P1, 84–431–BKC–3P1 and 84–433–BKC–3P1.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Jan. 3, 1989.

Ira Rubin, Dayton, Ohio, for Robert L. Young, Orlando, Fla., for objectors.

Karen E. Wagner, New York City, for Morgan Banks.

George Ridge, Jacksonville, Fla., for Post–Confirmation Administrator.

## MEMORANDUM OPINION

GEORGE L. PROCTOR, Bankruptcy Judge.

This contested matter is before the Court upon objections to the proofs of claims filed by Morgan Guaranty Trust Company of New York ("Morgan Guaranty") and Morgan Bank (Delaware) ("Morgan Delaware"). The claimants are hereinafter collectively referred to as the "Morgan Banks." The objecting parties are former limited partners of The Monetary Group ("TMG"), The Securities Group ("TSG"), and The Securities Group 1980 ("TSG80"), who were authorized to file objections to these claims by Order entered August 11, 1986.

A trial of the objections was held August 25, 1988, and upon the evidence offered, including the evidence submitted during the trial of *Lowin v. Dayton Securities Associates*, Adv. No. 85–214, on July 28 and 29, 1988, the Court enters the following Memorandum Opinion:

## THE FACTS

The debtors, TMG, TSG and TSG80, are New York limited partnerships involved in Chapter 11 reorganization proceedings before this Court. At all times pertinent to this action, the partnerships conducted business out of offices in New York City. The Securities Groups ("Groups") is a New York partnership whose general partners consisted of TMG, TSG and TSG80. Charles Agee Atkins ("Atkins") was the founder and managing general partner of TSG, TSG80, TMG and Groups.

Groups was formed in 1978 as a securities trading partnership which sought to maximize the total return to investors by taking advantage of certain tax shelter benefits. The business of Groups was described in its 1980 annual report as "among the nation's best capitalized investment firms" with "established expertise." Groups served in "[m]arket making, asset management and financial advisory services [which] are provided by highly trained professionals with strong backgrounds in economics and finance." Pl.Ex. 95.

As of July 1980, The Securities Groups Asset Management Group included "The Leasing Group, Inc., our equipment financing affiliate, [which] became active in July 1980." Pl.Ex. 38, 95; *See also*, Pl.Ex. 2. The Leasing Group, Inc. ("Leasing") was

TSG's wholly owned subsidiary and was created by Groups to take advantage of opportunities in the equipment leasing business. Leasing's business related to Group's overall investment strategy by "provid[ing] both leases and loans for the acquisition of capital goods. The Company, while adding to its own portfolio, will also prepare and manage single investor leases and leverage leases for participation by investors." Pl.Ex. 95.

Steven R. Hageman, one of Group's general partners, testified to the business purpose of creating Leasing:

"Mr. Atkins, Mr. Charles Atkins, had indicated a desire at one of our many meetings that he wished to expand into areas of business that was financially related. He saw our role and [Groups] growing to be what he defined as a—as a merchant bank, and that we would be involved in many different areas of financial investments concerned with interest rate and financial-type investments."

Tr. II–193–194.

In November, 1980, Steven R. Hageman together with Robert G. Hageman, the President of Leasing, approached George D. Morgan, III, Vice–President of Morgan Guaranty, to discuss an extension of credit to Leasing. Groups' general partners informed the Morgan Banks that Leasing had been created by Groups to increase its stability and to provide additional tax benefits for the limited partners of Groups.

At the time Groups solicited the loans from the Morgan Banks, Leasing's capitalization was insufficient to warrant any extension of credit. Group's credit, however, could support the proposed loans.

The Morgan Banks ultimately extended three loans to Leasing, totaling almost $7.4 million. The first loan was made August 11, 1981, in the amount of $2.5 million. The second was made August 31, 1981, for $2.5 million and the third on January 15, 1982, in the amount of $2,361,997.13. The loans were to finance the purchase and lease of three oil drilling rigs and each note was secured by this oil-well drilling equipment. In addition, Groups unconditionally guaranteed the obligations to the Morgan

Banks by written contracts executed in the Fall of 1981 and in early Spring 1982.

Each note further provided for amortization of principal and interest on specified terms, and included a provision that:

"If this note is not paid in full when due, the undersigned [defined to include successors or assigns] agrees to pay all costs and expenses of collection, including a reasonable attorney's fee."

Pl.Ex. 54, Exh. B; Pl.Ex. 62, Exh. B.

In extending credit to Leasing, the Morgan Banks attached little or no importance to either the creditworthiness of Leasing or to the value of the collateral, but instead relied on the financial strength of Groups. Callable capital commitments of $173 million were reported on Group's 1980 audited balance sheets.

The foundation of the Morgan Banks' decision to lend credit is detailed in a contemporaneous credit memorandum of August 27, 1981 by Lorenzo Villalon, who was charged with investigating the credit information upon which the Banks relied. From this memorandum, it is apparent that the Banks focused primarily on the financial strength of Groups:

"It is clear that the creditworthiness of the proposed loan is a function of the financial strength of the Guarantor, [Groups].... The substantial amount of capital that has already been contributed and the caliber of the partners involved lend credibility and provide financial support to it .. given the financial resources of the individuals involved, it is not unreasonable to assume that a substantial part of the capital which is legally on call would be available, should circumstances warrant it."

Pl.Ex. 103.

Steven R. Hageman and Robert F. Gubitosi, both general partners and members of the Executive Committee of Groups, executed the separate guaranties supporting the three loans. Both testified that in addition to having the legal authority of a general partner to act for the partnership, they were authorized by Group's managing partner, to execute the guaranties. Atkins,

whose testimony was offered by the objectors, did not dispute the authority of the general partners to execute the guaranties, the validity of the guaranties, or the relationship between the guaranties and Group's business.

The oil rigs secured by the loans were leased to Empire Oil and Gas Company ("Empire Oil"). In September, 1982, Empire Oil filed a petition for relief under Chapter 11 of the Bankruptcy Code in Colorado. 11 U.S.C. § 101, *et seq.* Consequently, Leasing was unable to perform its obligations to the Morgan Banks.

Despite Leasing's inability to meet its monthly obligations, there was no interruption in payments to the Morgan Banks because Groups acted promptly to service the debt pursuant to the guaranties which had been given in 1981 and 1982. Groups continued to make such payments for over two years. In March, 1983, Groups acquired Leasing's rights in the oil rigs and formally assumed Leasing's obligations to the Morgan Banks. Pl.Ex. 92.

In addition to the payments and the assumption, Group's guaranty obligations were repeatedly ratified by Groups. On August 31, 1983, Atkins met with Mr. Murray of Morgan Bank to explain an ongoing "Liquidation Plan" of Groups' business which listed as a liability of Groups an "Oil Rig Debt—$4,900,000." Contemporaneous memoranda in the Morgan Banks' files evidenced Atkins' stated intention on behalf of Groups to pay these outstanding obligations.

In January 1984, Atkins, in a letter to the Morgan Banks, described a plan to transfer the assets and liabilities of Groups to the Southern California Savings and Loan Association ("SoCal"). Pl.Ex. 98. The schedule of assets and liabilities to be transferred expressly included Groups' continuing obligation to the Morgan Banks (unless and until the transfers to SoCal were approved by the Federal Bank Board). The letter reads:

"[T]he responsibility for the payment of interest and amortization on the debt remains with The Securities Groups and we intend to continue to honor our obligation."
Pl.Ex. 98.

On March 30, 1984, within ninety days prior to the filing Chapter 11 petitions for TMG, TSG, TSG80, Groups, and Charles Atkins, individually, Atkins again wrote the Morgan Banks. This time Atkins acknowledged, but then announced Groups' anticipatory breach of, Groups' obligations:

"We have been advised by counsel that [Groups] is not responsible for making any further payments to Morgan, and this constitutes our notice to you that no further payments will be made to Morgan by [Groups]."
Pl.Ex. 111.

Groups made no further payments to the Morgan Banks. The Morgan Banks sent written demand for payment in full and then commenced separate foreclosure suits against Groups. Those suits were stayed by the provisions of 11 U.S.C. § 362 when Groups filed for relief under Chapter 11 of the Bankruptcy Code on May 25, 1984.

By Order of this Court of July 11, 1984, the Morgan Banks were given relief from the automatic stay to complete foreclosure and to auction off the oil-well drilling equipment. Both Groups and Leasing were given notice of the public auction to be held in Hobbs, New Mexico on August 15, 1984. This auction netted $892,058.20.

The Banks used to proceeds to offset Groups' liability to the Morgan Banks. A portion of these proceeds ($300,000) was eventually paid to the Trustee of the Empire Oil case pursuant to a settlement agreement of Groups, the Morgan Banks, and the Trustee. The Morgan Banks were then permitted to increase their claims in these cases by that amount.

Morgan Guaranty, after deducting the net proceeds received from the sale of the oil-well drilling equipment securing the loans, claims a principal balance of $2,057,-145.36 plus pre-petition and post-petition interest, attorneys' fees and costs. Morgan Bank claims a principal balance of $1,303,171.34, pre-petition and post-petition interest, attorneys' fees, and costs. Notwithstanding the filing of multiple claims

in each of the estates, only a single collection is being sought by each claimant on its respective claim.

On January 3, 1983, the objecting limited partners sold their limited partnership interests in the various limited partnerships to TSG Partners pursuant to a tender offer dated November 14, 1982. By Order entered August 11, 1986, the Court held the objecting limited partners have standing to object to the Morgan Banks' claims. The objectors assert, seven years after receipt of the benefit of the loans, that the Banks' claims are premised upon partnership obligations which are unenforceable for lack of authority and as *ultra vires*, and that certain collateral sold pursuant to order of this Court was not sold in a commercially reasonable manner.

The Morgan Banks contend that the objecting limited partners lack standing to contest the partnership's business relationships with third parties, that the guaranties were within the scope of Groups' business, that there is no evidence to support the *ultra vires* defense, and that the sale of the collateral was conducted in a commercially reasonable manner.

### DISCUSSION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Under 11 U.S.C. § 502(a), the limited partners, as parties in interest, have standing to object to the proofs of claims filed by the Morgan Banks. The Court rejects all arguments to the contrary.

### A. Authority To Bind The Partnership And The Ultra Vires Defense

Having determined that the former limited partners have standing to assert their objections, the Court must now deal with the argument that the guaranty of the notes was unauthorized. The law is clear that a partnership acts through its general partners, and that each general partner may bind the partnership. *Millard v. Newmark & Co.*, 24 A.D.2d 333, 337, 266 N.Y. S.2d 254, 259 (1st Dep't 1966); *Merrick v. New York Subways Advertising Co.*, 14 Misc.2d 456, 458, 178 N.Y.S.2d 814, 818

(Sup.Ct.N.Y.Co.1958); *see also* 68 C.J.S. *Partnership* §§ 141, 470.

█ As a general partnership composed solely of limited partnerships, TSG acted through the limited partnerships, which in turn acted through certain of their individual general partners. Both Hageman and Gubitosi have testified that, as members of Groups' Executive Committee, they were authorized, and indeed directed, to execute the guaranties on behalf of Groups. The managing general partner of Groups, Atkins, did not dispute this premise.

The objecting limited partners also argue that Hageman and Gubitosi were not general partners of Groups when the guaranties were signed. The Court disagrees and finds that the evidence supports the conclusion that they were in fact general partners in Groups. *See* Pl.Ex. 3, 17, 20, 21, 22, 23, 24, 27, and 28.

The objecting limited partners also suggest that because Groups was in the business of brokering in government securities, the guaranties of Leasing's obligations were outside the scope of Groups' business or were *ultra vires*. The Court does not agree.

█ As a matter of law, a partnership parent's guaranty of a subsidiary's obligations is always within the scope of the parent's business and binding upon the partnership. *In re Takara Partners*, Case No. 71–B–720, slip op. 8/5/80 (Bkrptcy.S.D. N.Y.1980) (guaranty of debtor's loan by partnership which had a stock interest in the debtor bound the partnership because guaranty served to protect and improve the value of the debtor's stock, promoted the business interests of the partnership and was made in furtherance of partnership purposes); *Andrews v. Congar*, 113 [131] U.S.App. 183, 26 L.Ed. 90 (1880) (where the guarantor partners owned a majority of stock in the debtor corporation and the guaranty was given to protect and improve the stock's value, the guaranty benefitted the entire partnership and consequently was within the scope of partnership business); *Westinghouse Credit Corp. v. N.D. P. Auto Supplies, Inc.*, 88 A.D.2d 933, 934,

450 N.Y.S.2d 876, 877 (2d Dep't 1982) (guarantee given by one corporation sufficiently interrelated to another and given in furtherance of guarantying corporation's corporate purpose is binding notwithstanding that the guaranty was not authorized by the guarantying corporation's shareholders); *American Surety Co. v. 14 Canal Street, Inc.*, 276 Mass. 119, 176 N.E. 785 (1931) (agreement to indemnify surety of debt of wholly-owned subsidiary benefits the parent based on community of interest of parent and subsidiary).

Even where the business of the guarantor is distinctly different from the business of the entity whose debt is guaranteed, courts have ruled that the guarantee is not *ultra vires* where the guarantor is interested in the success of the debtor. For example, in *Hess v. W. & J. Sloane*, 66 A.D. 522, 73 N.Y.S. 313 (1st Dep't 1901), *aff'd*, 173 N.Y. 616, 66 N.E. 1110 (1903), it was held that a seller was liable on its guaranty of a customer's debt because the guarantor had some interest, albeit indirect, in the success of its customer. Similarly, in *Brockport National Bank v. Webaco Oil Co.*, 257 A.D. 68, 12 N.Y.S.2d 652 (4th Dep't 1939), the court ruled that a corporation could endorse the note of another if the endorsement was given for the purpose of protecting its own business interests.

Here, the general partners have testified that "to the extent [Leasing] could operate profitably, then those profits would inure to the benefit of [Groups]." Tr. pp. II–86 (Gubitosi testimony). The Court has previously examined a general partner's ability to bind the partnership where the partner's action concerns matters apparently within the scope of the partnership's business:

> Furthermore, New York case law is abundantly clear that the actions of one partner need not be actually within the scope of the partnership's business to be binding on the other partners, so long as it is apparently within the scope of the partnership's business. *Bank of Commerce v. Desantis*, 451 N.Y.S.2d 974, 114 Misc.2d 491 (N.Y. City Civ.Ct.1982). *See also, Riley v. Larocque*, 297 N.Y.S. 756, 163 Misc. 423 (1937) (Even a professional partnership will be responsible if part-

ners participated in the wrongdoing, or closed their eyes to a fraud being perpetrated by one of them, where if the conduct, whether by acts or omissions, were such as to bind them with the mark of bad faith).

*In re The Securities Group*, 89 B.R. 204, 215 (Bkrptcy.M.D.Fla.1988).

Groups' obvious purpose in providing the guaranties was to induce the Morgan Banks to extend credit to Leasing, a wholly-owned subsidiary of Groups. Leasing was created to engage in leveraged leasing and other transactions which would provide income or tax benefits to the limited partners of Groups' constituent partnerships. Its business activities directly benefited the investors in the various parent partnerships. Thus, the written guaranties were clearly within the scope of Groups' business purposes.

This Court has previously recognized the broad powers conferred by the partnership agreements in these cases:

> [T]he agreements ... authorized the partnerships to "engage in any and all business activities as may be permitted by law including but not limited ... investment related activities."

*In re The Securities Group*, 89 B.R. at 218. Any claim that the business was outside the scope of Groups' partnership objectives should have been made at the time of Leasing's formation, not at the time the loans were solicited and the guaranties given. By the time the loans were made Leasing had already been acquired, Groups was actually in the business of equipment leasing, and its financial statements fully disclosed that business.

The investors in the various partnerships enjoyed the tax saving benefits which investing in oil drilling equipment provided, therefore, the defense of *ultra vires* is not well taken. In *Appleton v. Citizens' Central National Bank*, 190 N.Y. 417, 83 N.E. 470 (1908), *aff'd*, 216 U.S. 196, 30 S.Ct. 364, 54 L.Ed. 443 (1910), a bank, in order to obtain repayment of a loan, guaranteed the loan by its borrower of a larger sum from another bank. When sued on its guaranty,

it asserted an *ultra vires* defense. The defense was rejected. Said the Court:

> We may assume that the contract was *ultra vires*. We may further assume that in transactions by national banks we should adopt the law of *ultra vires* as it prevails in the Federal courts, and not the local law on the subject. Yet the defendant, in our opinion, became plainly liable for the amount which it received under the *ultra vires* contract. The law which obtains in this state and in several other jurisdictions is that where one party has received the full benefit of an *ultra vires* contract it cannot plead the invalidity of the contract to defeat an action upon it by the other party.

*Id.* 190 N.Y. at 420–421, 83 N.E. at 471. *See also, State Bank of Commerce v. Stone,* 261 N.Y. 175, 187, 184 N.E. 750, 754 (1933); *Patchogue Properties, Inc. v. Cirillo,* 54 Misc.2d 863, 865, 283 N.Y.S.2d 560, 563 (Dist. Ct. Suffolk Co.1967), *aff'd,* 60 Misc.2d 71, 302 N.Y.S.2d 58 (Sup.Ct., App. Term, 2d Dep't 1969).

It is the long settled law of New York, and other jurisdictions, that the doctrine of *ultra vires* will not be applied to work an injustice by the party benefited by a contract. *See, e.g., City of Buffalo v. Balcom,* 134 N.Y. 532, 536, 32 N.E. 7, 9 (1892) ("The rule which denies to a party benefited by a contract the right to question its validity is founded upon estoppel, and that doctrine has been so frequently applied to defeat the plea of *ultra vires,* that there is no occasion now to attempt its further discussion, or state the reason for its application"). The objecting partners clearly received the benefits of the loan transaction but now want to avoid the consequences. To sustain the defense of *ultra vires* would in this instance work a clear injustice to the Morgan Banks.

### B.  Failure of Consideration Argument

■  There can be no dispute in this case that the Morgan Banks loaned millions of dollars to Leasing, a wholly owned subsidiary of Groups, and that the funds were used to further the business of Leasing. This in turn would add value to the net worth of Groups. Nevertheless, some of the objecting partners have advanced the concept that because two of the guaranties were executed after the closing of the loans, no consideration existed. Such assertion is misplaced.

Under New York law, a written promise is not invalid for want of consideration if it expresses past consideration.

> A promise in writing and signed by the promisor by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to be given or performed and would be a valid consideration but for the time when it was given or performed.

McKinney's New York *General Obligations Law* § 5–1105 (1988 Supp.).

Under Section 5–1105, a written guarantee which refers to the amount and purpose of past consideration of the guaranty is enforceable. *See, e.g., In re Levine,* 32 B.R. 742, 745 (S.D.N.Y.1983), *aff'd,* 732 F.2d 141 (2d Cir.1984) ("[Section 5–1105] appears to have been adopted precisely to avoid the anomaly of denying a promise the effect that both sides to the promise clearly intended it to have."); *Holt v. Feigenbaum,* 52 N.Y.2d 291, 419 N.E.2d 332 (1981) (past consideration in the form of plaintiff's guaranties was clearly identified in indemnity agreement); *American Bank & Trust Co. v. Lichtenstein,* 48 A.D.2d 790, 790–791, 369 N.Y.S.2d 155, 157–158 (1st Dep't 1975), *aff'd,* 39 N.Y.2d 857, 352 N.E.2d 132, 386 N.Y.S.2d 215 (1976) (valid guarantees expressed "past consideration of 'any financial accommodations given'").

In *Chester Airport, Inc. v. Aeroflex Corp,* 37 Misc.2d 145, 148, 237 N.Y.S.2d 752, 754–755 (Sup.Ct. N.Y. Co.1962) it was said:

> The defense of lack of consideration cannot stand. The fact that the lease was executed between the parties thereto in Connecticut on November 17, 1960, and the guarantee was executed thereafter in New York on November 23, 1960, does not constitute a lack of consideration. Those instruments so executed, although

on different dates, can be considered to have been made contemporaneously. Even if the guarantee was based on a past consideration (which defendant contends renders its agreement ineffective), such contention is repudiated by subdivision 3 of section 33 of the Personal Property Law [now New York *General Obligations Law* § 5–1105].

The guaranties to Morgan Guaranty fulfill the requirements of § 5–1105. The guaranties, which are identical except for the dates of execution, are given "[as] an inducement to you for, and in consideration of, your making or extending one or more loans ... to The Leasing Group, Inc.," and each is dated as of the date of the loan in consideration of which it was given. Each guaranty specifies the amounts guaranteed, which equals the amounts of the loans supported by the related notes.

Secondly, the testimony of all participants is consistent to the effect that the loans were made wholly in reliance upon the guarantees. Such reliance constitutes sufficient consideration for the guarantees. *United States v. Lowell*, 557 F.2d 70, 72 (6th Cir.1977) ("new consideration is not required for a contract of guaranty executed subsequent to the principal contract [loan agreement], where it is executed pursuant to an understanding had before and is an inducement to the execution of the principal contract").

Third, it is common business practice to date documents as of the date upon which the parties intend the transaction to be effective. The guaranties in question bear the same dates as the loans intended to be guaranteed. Parties can agree that a contract be entered into "as of" an earlier date than that of execution, and the agreement will be effective retroactively. In *Matthews v. Jeremiah Burns, Inc.*, 205 Misc. 1006, 129 N.Y.S.2d 841 (Sup.Ct. N.Y. Co. 1954), the court held that an employee-union welfare fund agreement executed on May 11, 1949 was effective retroactively as of May 2, 1946:

> It is fundamental that where parties to an agreement expressly provide that a written be entered into "as of" an earlier date than that on which it was executed, the agreement is effective retroactively "as of" the earlier date and the parties are bound thereby ...

*Id.* 205 Misc. at 1013, 129 N.Y.S.2d at 847. *See also, Viacom International, Inc. v. Tandem Productions, Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd*, 526 F.2d 593 (2d Cir.1975) ("When a written contract provides that it shall be effective 'as of' an earlier date, it generally is retroactive to the earlier date").

### C. Ratification

■ Even if the act of guarantying Leasing's debt obligations was *ultra vires*, Groups' repeated ratification of its obligations to the Morgan Banks provides an independent basis for enforcement. Ratification is the express or implied adoption of the acts of one party by a second party for whom the first party acts without authority. 21 N.Y.Jur. *Estoppel, Ratification and Waiver*, § 85.

A partner's acts as an agent of a partnership, even if initially unauthorized, may be subsequently adopted by the partnership as its own and will be binding from the date of inception. Three elements are necessary for ratification to occur: (1) acceptance by the principal of the benefits of the agent's acts (2) with full knowledge of the facts, and (3) circumstances or affirmative election indicating an intention to adopt the unauthorized arrangement. *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir.1969).

Each of the elements of ratification is present here. First, because Groups' general partners agreed that Groups' would guarantee Leasing's obligations to the Morgan Banks, Leasing obtained millions of dollars of loans from the Banks, and as the parent partnership of Leasing, Groups directly benefited from the loans.

Secondly, conclusive evidence demonstrates that Groups had full knowledge of the facts surrounding the transaction. The repeated communications between Atkins and the Morgan Banks demonstrate detailed knowledge of the transactions on the

part of Groups' managing partner. Public financial statements and proxy materials of Groups sent to *all* partners describe in detail the existence and activities of Leasing and the fact that Groups had guaranteed those loans.

Furthermore, each partner is presumed to know what appears in the partnership books and is estopped from denying knowledge of transactions contained therein. *Flour City National Bank v. Widener,* 163 N.Y. 276, 57 N.E. 471 (1900); C.J.S. *Partnership* § 227. Where an entry relating to an unauthorized transaction is made in the books, after a reasonable lapse of time each partner will be presumed to have knowledge of the transaction. *In re Norris,* 18 F.Cas. 313 (D.Maine 1876) (No. 10,-302).

In this case, Groups made payments upon its guaranty obligation for over two years. Its accountant, Holden, as well as its general partners, gave uncontested testimony attesting to the fact that the obligations were carried on Groups' books and records since 1982.

Many other facts in the record demonstrate Groups' intention to adopt the acts of its managing general partners as its own. Groups time and time again affirmatively signalled both its full knowledge of its guaranty and its intention to be bound by its obligations stemming from the loans to Leasing. An intention to adopt a partner's conduct may be express, or may be implied based upon the acts, words, or conduct of the ratifying partners which reasonably tend to show such intention. 21 N.Y.Jur. *Estoppel, Ratification and Waiver,* §§ 86, 87; *see generally, Rende & Esposito Consultants, Inc. v. St. Augustine's Roman Catholic Church,* 131 A.D.2d 740, 516 N.Y.S.2d 959, 962 (2d Dep't 1987). In this case, Groups made regular payments pursuant to the guaranties for two years, assumed the debts directly in 1983, and repeatedly affirmed its intention to continue to honor its obligations. Such conduct constitutes ratification.

D. Commercial Reasonableness of The Sale

In a final effort to avoid liability, the objecting parties claim that the public auction of the oil rigs was not held in a commercially reasonable manner. Again, the evidence does not support such a conclusion.

Upon obtaining relief from the stay to permit a liquidation sale, the Morgan Banks hired Nelson International, an auctioneer of national repute with special expertise in appraising and selling oil drilling equipment, to conduct a public auction sale. Notice of the auction was widespread and was sent to both Groups and Leasing.

In selecting Nelson International, the Morgan Banks made a "good faith attempt to dispose of the collateral to the parties' mutual 'best advantage'." *Central Budget Corp. v. Garrett,* 48 A.D.2d 825, 368 N.Y.S.2d 268, 270 (2d Dep't 1975) (the disposition of collateral upon a lawful repossession is "commercially reasonable" where that disposition is "made in the good faith attempt to dispose of the collateral to the parties' mutual 'best advantage' ").

Under the New York Uniform Commercial Code, the primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale. *In re Zsa Zsa, Ltd.,* 352 F.Supp. 665, 671 (S.D.N.Y.1972). In this case, the sale was public, prompt, extensively advertised, and in all other respects conducted under conditions calculated to obtain the highest possible price. As a matter of law, the sale was commercially reasonable. *See e.g., First City Division of Chase Lincoln First Bank v. Vitale,* 123 A.D.2d 207, 212, 510 N.Y.S.2d 766, 769–770 (3rd Dep't 1987) (evidence concerning notice, advertisement, selection of the auctioneer, the basis for timing of the sale and that the prices received represented the fair market value of the property constitutes *prima facie* showing of commercial reasonableness); *Personal Jet, Inc. v. Callihan,* 624 F.2d 562, 569 (5th Cir.1980) (bank's public sale of collateral was commercially reasonable where a professional appraiser and auctioneer was retained to inventory, advertise, and display the collateral); *Greg Coats Cars, Inc. v. Kasey,* 576

S.W.2d 251, 253 (Ky.App.1978) (repossession sale of automobile was commercially reasonable where finance company notified the buyer and seller that the car would be sold at public auction, and the auction occurred at a time and place customary for such sales).

## CONCLUSION

Upon the evidence presented at the August 25th hearing, the Court concludes that the guaranties given by Groups on behalf of Leasing were properly authorized, furthered the partnerships' business interests, were supported by adequate consideration, and were not outside the scope of the partnerships' business.

Even if the guaranties were *ultra vires*, the evidence indicates that the general partners of Groups ratified the agreements through their subsequent conduct. Moreover, the Court holds that the defense of *ultra vires* cannot be asserted in this instance where the objecting partners received the benefits of the loans to Leasing.

Finally, the Court concludes that the sale of Morgan Banks' collateral was conducted in a commercially reasonable manner designed to obtain the highest possible price.

The Court will overrule the objections and will allow the claims to stand as filed.

The Court will enter a separate order in accordance with this Memorandum Opinion.