**In re The SECURITIES GROUP, Debtor.**

**DAYTON SECURITIES ASSOCIATES and Aircraft Investment Associates, et al., Plaintiffs–Appellants,**

v.

**MORGAN GUARANTY TRUST COMPANY OF NEW YORK and Morgan Bank (Delaware), Defendants–Appellees,**

**Louis Lowin, Post–Confirmation Administrator, Defendant.**

**No. 90–3467.**

United States Court of Appeals, Eleventh Circuit.

March 15, 1991.

Robert L. Young, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, Fla., Ira Rubin, Goldman, Rubin & Shapiro, Dayton, Ohio, for plaintiffs-appellants.

Karen E. Wagner, Barbara L. Giuffre, Davis, Polk & Wardwell, New York City, for Morgan.

George E. Ridge, Kent, Ridge & Crawford, Jacksonville, Fla., for Lowin.

Before COX and BIRCH, Circuit Judges, and GIBSON *, Senior Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge:

The limited partners of three limited partnerships ("the Objectors") appeal the district court's[1] affirmance of the bankruptcy court's[2] dismissal of their objections to claims asserted by Morgan Guaranty Trust Company of New York and Morgan Guaranty (Delaware) in a Chapter 11 bankruptcy proceeding. We affirm.

## I. BACKGROUND

The Securities Group ("TSG") was a limited partnership formed under the laws of New York in 1978 by Charles Agee Atkins ("Atkins"). In 1979 he formed The Monetary Group ("TMG") and in 1980 he formed The Securities Group 1980 ("TSG80"). TMG and TSG80 were also limited partnerships formed under the laws of New York. All three limited partnerships were designed to generate income tax deductions for their limited partners while still providing opportunities for economic gain. Atkins was the managing general partner for all three limited partnerships. Additionally, Steven Hageman was a general partner of both TMG and TSG80; there were other general partners of the three limited part-

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. The Honorable John H. Moore, II, United States District Judge for the Middle District of Florida.

2. The Honorable George L. Proctor, United States Bankruptcy Judge for the Middle District of Florida. The bankruptcy court's opinion in this case is reported as *In re Monetary Group*, 95 B.R. 803 (Bank.M.D.Fla.1989).

nerships, but they are not relevant to this proceeding.

The Securities Groups ("Groups"), a general partnership, was also formed by Atkins in 1979, and Atkins served as its managing partner. Groups was created to economize the operations of TSG and TMG and act as their operating entity. When TSG80 was formed, it also became a member of the partnership.

In 1980, Groups invested in The Leasing Group, Inc. ("Leasing"). By April 1981, Groups owned seventy of the 100 issued shares of Leasing; the remaining thirty shares were owned by Leasing's president, Robert Hageman (Steven Hageman's father).

In 1981, Steven Hageman contacted Morgan Guaranty Trust Company of New York ("Morgan Guaranty") in order to obtain a line of credit to finance Leasing's purchase of oil-well drilling equipment. Leasing planned to purchase the equipment and then lease it to other companies. Morgan Guaranty indicated that Leasing's financial condition was a problem and that credit could not be extended unless Groups guaranteed the loan.

Ultimately, it was agreed that Groups would guarantee the loans. Morgan Guaranty made its first loan to Leasing for $2.5 million on August 11, 1981. Steven Hageman executed a guaranty on behalf of Groups; the guaranty was dated August 14 and was notarized on October 7. Morgan Guaranty made a second $2.5 million loan on August 31, 1981, and Steven Hageman executed Groups' guaranty for this loan as well. The guaranty was dated August 31 and was notarized on October 7. On January 15, 1982, Morgan Guaranty (Delaware) ("Morgan Delaware")[3] loaned over $2.3 million to Leasing; Groups' guaranty to Morgan Delaware was executed on the same day.

The oil rigs purchased by Leasing were leased to Empire Oil and Gas Company ("Empire"). Empire filed for relief under Chapter 11 of the Bankruptcy Code in September 1982. Consequently, Leasing was unable to meet its loan obligations to the Morgan Banks, but Groups continued servicing the debt for over two years. In March 1983, Groups obtained Leasing's interests in the oil rigs and formally assumed Leasing's obligations to the Morgan Banks.

In May 1984, Groups and its three constituent limited partnerships filed for Chapter 11 relief. The Morgan Banks were granted relief from the stay and sold the oil-well drilling equipment; they then filed claims in all four bankruptcy estates, seeking the balance owed. Some of the limited partners objected, alleging that the making of the guarantees were ultra vires acts and that the guarantees lacked proper consideration.[4]

## II. DISCUSSION

### A. The Scope of Groups' Business

The Objectors insist that the making of the guarantees was ultra vires as to the three limited partnerships as well as to Groups, and hence the guaranties are unenforceable. We disagree.

Partnerships act through their partners, which in the case of Groups happened to be the three limited partnerships. In turn, the limited partnerships carried on the business of the general partnership through certain of their own human general partners. *Monetary Group*, 95 B.R. at 807. These general partners thus acted in two capacities as general partners of the limited partnerships: 1) carrying on the business of the limited partnerships, and 2) carrying on the business of the general partnership, Groups.

Because the guarantees were made by a general partnership, the authority of the partners was controlled not by corpo-

---

**3.** Morgan Guaranty and Morgan Delaware will be referred to collectively as "the Morgan Banks."

**4.** The Objectors also contended that the oil rigs were not sold in a commercially reasonable manner. *Monetary Group*, 95 B.R. at 807. This issue is not before us on appeal.

rate principles[5] but by the provisions of partnership law, which provide that:

> Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

N.Y. Partnership Law § 20, subd. 1 (Consol.1976 & Supp.1990).[6] As is made clear by the use of the adverb "apparently," the partner need not be engaged in the actual business of the partnership; his acts need only be "apparently within the scope of the partnership business." *Bank of Commerce v. De Santis*, 114 Misc.2d 491, 494, 451 N.Y.S.2d 974, 977 (N.Y.Civ.Ct.1982).

■ Guarantying the debts of another entity is generally not within the apparent business of a partnership; however, this generality can be altered by the terms of a given partnership agreement. *Chelsea Nat'l Bank v. Lincoln Plaza Towers Assocs.*, 93 A.D.2d 216, 217, 461 N.Y.S.2d 328, 330 (1983), *aff'd*, 61 N.Y.2d 817, 473 N.Y. S.2d 953, 462 N.E.2d 130 (1984). In Article I, § 3 of Groups' partnership agreement the "objects and purposes" of the partnership are described. The activities depicted therein all relate broadly to financial and investment activities. However, one particular sentence is of special importance to the case at hand; it permits Groups to "engage in such other fee earning activities as portfolio management and the arrangement of financing for corporations or other entities."[7] It is because of this language that the making of the guaranties was within Groups' apparent business.

Groups initiated contacts and negotiated with the Morgan Banks in order to obtain financing for Leasing. Such activity is clearly a part of the "arrangement of financing" permitted by Groups' partnership agreement. Furthermore, it is not beyond belief that a financially strong company, as Groups was at the time, might guaranty the debts of another entity for which it arranges financing. Given this context, we believe that the making of the guarantees was apparently within the scope of Groups' business and the partnership is bound by them.[8]

■ We would reach the same result even if the making of the guaranties was not apparently within the scope of Groups' business. A partnership may ratify its partners' actions, even though those actions were beyond the scope permitted by the partnership agreement. *See Application of Lester*, 87 Misc.2d 717, 723, 386 N.Y.S.2d 509, 514 (N.Y.Sup.Ct.1976) (dis-

---

5. The appellants consistently cast their argument as one alleging the guaranties were ultra vires with respect to the partnerships. Ultra vires is a uniquely corporate concept, arising out of an historical fear and distrust of the corporate form. *See Louis K. Liggett Co. v. Lee*, 288 U.S. 517, 548–49, 554–56, 53 S.Ct. 481, 489–90, 492–93, 77 L.Ed. 929 (1933) (Brandeis, J., dissenting). Indeed, almost all of the cases cited by the appellants involve corporations, not partnerships. We do not believe that this uniquely corporate concept controls this case.

6. The Objectors concede that "[t]he question is not whether a representative of Groups and its constituent partnerships exceeded *his* authority. Rather, the issue is whether Groups and the constituent partnerships exceeded *their* authority...." Appellants' Reply Brief at 2–3 (emphasis in original). Consequently, we accept as true that Groups' representatives "were authorized, and indeed directed, to execute the guaranties on behalf of Groups." *Monetary Group*, 95 B.R. at 807.

7. Interestingly, similar language appeared in the limited partnership certificates of both TMG and TSG80.

8. The bankruptcy court rested its decision on a different ground, holding that "a partnership parent's guaranty of a subsidiary's obligations is always within the scope of the parent's business and binding upon the partnership." *Monetary Group*, 95 B.R. at 807. While we have no specific quarrel with this statement, we are not willing to embrace such a far-reaching rule of law, particularly when a narrower basis for upholding the decision exists. We are, of course, "free to affirm on any ground supported by the record." *Railway Labor Executives' Ass'n v. Southern Ry. Co.*, 860 F.2d 1038, 1040 n. 2 (11th Cir.1988).

cussing possibility of ratification of act not in the carrying on of the business in the usual way); *Simmons v. Quick–Stop Food Mart, Inc.*, 307 N.C. 33, 40, 296 S.E.2d 275, 280 (1982) (discussion under North Carolina's version of the Uniform Partnership Act).[9]

A ratification occurs when the benefits of the purportedly unauthorized acts are accepted with full knowledge of the facts under circumstances demonstrating the intent to adopt the unauthorized arrangement. *Monarch Ins. Co. of Ohio v. Insurance Corp. of Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir.1987); *Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F.Supp. 748, 752 (S.D. N.Y.1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir.1969). The existence of a ratification depends upon the circumstances and is a question to be determined by the factfinder. *Bertran Packing, Inc. v. Transworld Fabricators*, 50 A.D.2d 542, 543, 375 N.Y.S.2d 335, 337 (1975). Consequently, the bankruptcy court's findings in this regard are not to be disturbed unless they are clearly erroneous. *See* Bankruptcy Rule 8013.

█ The bankruptcy court determined that, "as the parent partnership of Leasing, Groups directly benefited from the loans." *Monetary Group*, 95 B.R. at 810. The logic supporting this statement seems inescapable. To the extent that the loans from the Morgan Banks allowed or facilitated Leasing's efforts to do business, Groups benefited because it owned 70% of Leasing's stock.[10] In this regard, it is important to note that the Morgan Banks would not have loaned the money if Groups had not guaranteed the loans, *id.* at 805; consequently, the loans greatly enhanced Groups' ability to realize a return on its investment in Leasing.

The bankruptcy court also determined that "[t]he repeated communications between Atkins and the Morgan Banks demonstrate detailed knowledge of the transactions on the part of Groups' managing partner. Public financial statements and proxy materials of Groups sent to *all* partners describe in detail the existence and activities of Leasing and the fact that Groups had guaranteed those loans." *Id.* at 810–11 (emphasis in original). The bankruptcy judge also determined that Groups demonstrated its intent to adopt the obligations by making "regular payments pursuant to the guaranties for two years, assum[ing] the debts directly in 1983, and repeatedly affirm[ing] its intention to continue to honor its obligations." *Id.* at 811. Having reviewed the record, we are not firmly convinced that the bankruptcy court erred in determining that these acts demonstrated Groups' intent to adopt the terms of the guaranties. *See Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

### B. Validity of the Consideration

The Objectors contend that the guaranties made to Morgan Guaranty are unenforceable because they were premised upon past consideration.[11] New York law specifies the circumstances in which a contract will be enforced in spite of past or executed consideration:

---

**9.** The ability of a partnership to ratify acts that lie outside the apparent scope of its business is supported in at least two places in New York's codified law. Because such an act can be authorized in advance, *see* N.Y. Partnership Law § 20, subd. 2 (Consol.1976 & Supp.1990), it follows that a partnership can ratify such an act after it occurs. Secondly, New York's partnership law specifically indicates that the laws of agency apply to partnerships, *id.* § 4, subd. 3; inasmuch as ratification is an agency concept, it applies in this case.

**10.** The Objectors rely heavily upon *Savannah Ice Co. v. Canal–Louisiana Bank & Trust Co.*, 12 Ga.App. 818, 79 S.E. 45 (1913) for the proposition that this purported benefit is too insubstan-

tial to support a ratification. *Savannah Ice* is inapplicable. We respectfully doubt that a turn of the century case from the Georgia Court of Appeals accurately portrays the current state of New York law. Furthermore, *Savannah Ice* did not discuss ratification, but rather focused upon whether a guaranty was ultra vires as to one of the corporations involved in the case. *See id.* at 824, 79 S.E. at 49. For these reasons, we decline to rely upon this decision.

**11.** The Objectors do not make this argument with respect to the guaranty issued to Morgan Delaware, apparently satisfied that this guaranty was made at the same time as the underlying loan.

A promise in writing and signed by the promisor or by his agent shall not be denied effect as a valid contractual obligation on the ground that consideration for the promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y.Gen.Oblig.Law § 5–1105 (Consol.1976 & Supp.1990).

Before deciding whether the guaranties satisfy the requirements set forth above, we must first decide whether the loans constituted past consideration. While the two guaranties in question were notarized on October 7, they both reflected that they were signed by Hageman on different dates. Specifically, the guaranty for the August 11 loan indicated that it was signed on August 14, and the guaranty for the August 31 loan indicated that it was signed on August 31. The guaranties thus reflect Hageman's intent that the guaranties be effective as of August 14 and August 31, respectively. We must give effect to this intent, *Matthews v. Jeremiah Burns, Inc.*, 205 Misc. 1006, 1013–14, 129 N.Y.S.2d 841, 847 (N.Y.Sup.Ct.1954); *see also Viacom Int'l Inc. v. Tandem Prods., Inc.*, 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), *aff'd*, 526 F.2d 593 (2d Cir.1975) and when this is done, there is clearly no past consideration with regard to the August 31 loan, regardless of the assistance provided by the statute.[12]

■ We now turn our attention to the August 11 loan. Even under our analysis above, the guaranty was made three days after this loan was made. The Objectors ask that we apply a common sense approach; because the guaranty was made after the loan, the loan must constitute past consideration for the guaranty. While we recognize the simplicity of such a bright-line approach, New York courts have not adopted this analysis. In *Chester Airport, Inc. v. Aeroflex Corp.*, 37 Misc.2d 145, 148, 237 N.Y.S.2d 752 (N.Y.Sup.Ct.

1962), *modified on other grounds*, 18 A.D.2d 998, 238 N.Y.S.2d 715 (1963) (per curiam), the court reasoned thusly in determining that § 5–1105 was not implicated:

The fact that the lease was executed between the parties thereto in Connecticut on November 17, 1960, and the guarantee was executed thereafter in New York on November 23, 1960, does not constitute a lack of consideration. Those instruments so executed, although on different dates, can be considered to have been made contemporaneously.

*Id.* at 148, 237 N.Y.S.2d at 754–55. We are not willing to adopt a stricter analysis than is used by the courts in whose jurisdiction this statute lies. If New York courts consider instruments executed six days apart to have been executed contemporaneously, we will do the same with regard to documents that have been effectively executed only three days apart.

Even if the statute does apply, we believe that the guaranties sufficiently comport with the statute's requirements. The only real issue raised in this regard is whether the guaranties adequately "express" the alleged past consideration. The Objectors contend that the statute's use of the verb "express" requires that the past consideration be described exactly and precisely, *see Persico Oil Co.. v. Levy*, 64 Misc.2d 1091, 1092, 316 N.Y.S.2d 924, 925 (N.Y.Sup.Ct.1970), and the nature of the consideration must be ascertainable without resort to extrinsic evidence. *See Umscheid v. Simnacher*, 106 A.D.2d 380, 381, 482 N.Y.S.2d 295, 298 (1984). However, these two cases involve fact situations markedly different than that found in the case at bar.

In *Persico*, the promisor pledged to "try to send a monthly payment" in order to "clear up" an unidentified bill. *Persico*, 316 N.Y.S.2d at 925. The court was troubled by the fact that there was no indication how much money was owed or what products or services had been received by the promisor. *Id.* 316 N.Y.S.2d at 925–26.

---

**12.** The Objectors correctly note that the phrase "as of" does not appear in the guaranties. However, these words are in no way talismanic; no authority indicates that their presence is necessary for a party to achieve the result we have described.

In *Umscheid,* the promisor pledged, in pertinent part, as follows: "I also want to reimburse Julia Umscheid for all the things she paid for me, taxes, oil, groceries and so on. I also want to pay Julia Umscheid for coming up to my house and looking after me, my property, and my animals." *Umscheid,* 106 A.D.2d at 381, 482 N.Y.S.2d at 297. In addition to expressing doubts that this constituted "an unequivocal promise to pay a sum certain at a date certain," *id.* at 381, 482 N.Y.S.2d at 297, the court characterized the description of the services received as "vague, imprecise, and, indeed, ... without meaning." *Id.* at 381, 482 N.Y. S.2d at 298.

As the bankruptcy court correctly noted, Groups' guaranties indicated that they were "given '[as] an inducement to you for, and in consideration of, your making or extending one or more loans ... to the Leasing Group, Inc.' ... Each guaranty specifies the amounts guaranteed, which equals the amounts of the loans supported by the related notes." *Monetary Group,* 95 B.R. at 810. In these respects, the guaranties are more specific than those at issue in the cases the Objectors rely upon. We further note that language less specific than that present here has been held to satisfy the statute's requirements. *See American Bank & Trust Co. v. Lichtenstein,* 48 A.D.2d 790, 790–91, 369 N.Y.S.2d 155, 157–58 (1975) (guarantees indicated that they were made "upon the expressed past consideration of 'any financial accommodations given' "), *aff'd,* 39 N.Y.2d 857, 386 N.Y.S.2d 215, 352 N.E.2d 132 (1976).[13] For these reasons, we hold that even if the statute applies to this case, the guaranties satisfied the requirements imposed by New York law.

## III. CONCLUSION

The claims of the Morgan Banks survive the objections presented to the bankruptcy court. The partnership, Groups, is liable

for the guaranties because the making of said guaranties was within the apparent scope of Groups' business and, even if it was not, Groups ratified the making of the guaranties. The guaranties were not premised upon the receipt of past consideration and, even if they were, the guaranties satisfy the requirements of New York law. Consequently, the judgment of the district court is

AFFIRMED.

---

13. The Objectors do not deny that Groups' promise to guaranty the loans was both solicited and made prior to Morgan Guaranty's agreement to loan money to Leasing. *See Monetary Group,* 95 B.R. at 805. This, of course, does not control the decision in this case; however, it

seems clear that § 5–1105 was "adopted precisely to avoid the anomaly of denying a promise the effect that both sides to the promise clearly intended it to have." *In re Levine,* 32 B.R. 742, 745 (S.D.N.Y.1983), *aff'd,* 732 F.2d 141 (2d Cir. 1984).