NEWMAN, Circuit Judge,
dissenting.
The district court, applying the laws of contract and property transfer, held that the three patents in suit were owned by the plaintiff Abraxis when this suit was filed, and that the plaintiff had standing to bring this suit. The defendant did not seek interlocutory review of that ruling; and there have been over three years of litigation, including full trial of infringement of all three patents, and judicial determination of complex questions of law and fact concerning the Hatch-Waxman Act and its application. This court now finds that the plaintiff did not have standing, after all.
The court thus erases the trial, nullifies the judgment, cancels the appeal, and sends the case back so that the parties and the district court and this court can do it all again. However, the court has not shown reversible error in the district court’s ruling on the question of standing, a ruling based on state contract and commercial transaction law. Instead, the panel majority creates a new and convoluted law unique to the patent aspect of commercial transactions. No special public policy is served, and no reason exists for creating a new commercial law, divergent from the governing state law, when the subject of the commercial sale is a patent. I must, respectfully, dissent.
Discussion
New York law applies to these sales and transfer agreements. All of the documents state, and the parties and the district court agree, that the Asset Purchase Agreement and all of the related agreements are governed by New York law. Indeed, the choice of law is fundamental to this court’s ruling, for my colleagues do not dispute that when New York law is applied, the district court’s decision on standing should be upheld. Instead, the panel majority holds, contrary to New York law, that these commercial contracts cannot be given the effective date of the sales contract, on which these patents were sold and ownership was transferred. Thus although the parties to these contracts do not dispute their effective date, my colleagues now permit third parties to challenge and invalidate this commercial transaction, despite its undisputed validity as between the parties to the transaction.
New York law is otherwise. Indeed, all state and federal law is otherwise.
A
The master agreement between AstraZeneca UK and Abraxis, called the Asset Purchase Agreement (APA) and dated April 26, 2006, provided for the sale and purchase of eight pharmaceutical products and their patents. This master agreement contains a complex series of avowals, warranties, covenants, and considerations provided by each party and states that various aspects will be the subject of “Acquisition Documents,” defining these “Acquisition Documents” as “any and all other agreements, instruments, certificates and other documents executed and delivered in connection with this Agreement.” APA § 1.1. Section 3.1 of the APA states that
*1369 the effectiveness of the documents, agreements, opinions and certificates delivered in accordance with [the APA], and the consummation of the transactions contemplated hereby shall be deemed to occur at the Effective Time.
The Effective Time is defined as “12:01 a.m., New York time on the Closing Date.” The Closing Date is defined as June 28, 2006.
The Asset Purchase Agreement defines “Transferred Patent Rights” as the patents relating to the products that were sold. For the Transferred Patent Rights, APA § 2.1(e) provides that AstraZeneca UK (“the Seller”)
shall, or shall cause one or more of its Affiliates to, Transfer to the Purchaser, and the Purchaser shall purchase and accept from the Seller or its Affiliates, as applicable, all of the right, title and interests of the Seller and its Affiliates in and to ... all Transferred Patent Rights.
On June 28, 2006 the Intellectual Property Assignment Agreement was executed. This agreement states that the “provisions of this instrument are subject to the terms and conditions of the Purchase Agreement.” The agreement states that the seller “hereby sells, assigns, conveys and transfers to Buyer ... all of Seller’s right, title and interest” in the patents on the attached Schedule A. Schedule A lists the three patents in suit, and other patents. The Intellectual Property Assignment Agreement includes a “Further Assurances” clause, wherein AstraZeneca UK agrees that it will “do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, any and all further acts, conveyances, transfers, assignments, and assurances as necessary to grant, sell, convey, assign, transfer, set over to or vest in Buyer any of the Transferred Intellectual Property.”
In early 2007 AstraZeneca UK learned that title to some of the patents on Schedule A remained with affiliates of AstraZeneca UK, and had not been formally assigned to Abraxis. Astra Lakemedel Aktieboag (“Astra L”) was still the nominal assignee of U.S. Patent 4,870,086, and AstraZeneca AB was still the nominal assignee of U.S. Patents 5,670,524 and 5,834,489. AstraZeneca UK acted in accordance with the Further Assurances clause, and on March 15, 2007 Astra L and AstraZeneca AB executed additional documents assigning these patents to AstraZeneca UK, the documents stating that “this instrument is being executed by the parties to enable the Transferee to further convey to Buyer that portion of the Transferred Assets” included in the Asset Purchase Agreement, “dated as of April 26, 2006 ... pursuant to which Transferee agreed to sell to Buyer and Buyer agreed to purchase from Transferee the Transferred Assets, all as more particularly set out in the Purchase Agreement,” with “consummation of the transactions ... deemed to occur at the Effective Time” on the Closing Date. APA § 3.1. On November 12, 2007 AstraZeneca UK executed an additional document “confirming” that Abraxis has owned all “right, title, and interest” to the patents in suit “since no later than June 28, 2006.”
It is not unusual to transfer a complex set of related assets through a master agreement and additional contracts and assurances. Here the specified patent rights were identified, and sold to Abraxis, in the Asset Purchase Agreement dated April 26, 2006. The patents were listed on Schedule A of the Intellectual Property Assignment Agreement dated June 28, 2006, and then, pursuant to the Further Assurances clause, on March 15, 2007 three of the patents that had been sold were subject to the Further Assurances of formal assign *1370 ment and delivery, as required by the Asset Purchase Agreement and implemented in the Intellectual Property Assignment Agreement. Nonetheless, my colleagues dismiss the suit for lack of standing, deeming the transfer a “nullity” on inapt authority. Maj. Op. at 1365.
The district court reached a different conclusion, upon correct analysis of the transaction documents and on the entire record.
B.
The district court, applying New York law of contracts and property transfers, held that the March 15, 2007 assignment documents were “delivered in accordance with” the terms of the Asset Purchase Agreement and were effective as of June 28, 2006, as stated therein. The district court determined that the June 28, 2006 Closing Date applied to all of the listed patents. The court stated: “Given this retroactive effect, the [Intellectual Property Assignment Agreement] would then operate to transfer title from [AstraZeneca UK] to Abraxis as of that date as well,” and held that the transfer was effective as of June 28, 2006. Abraxis BioScience, Inc. v. Navinta LLC, Civ. Action No. 07-1251, 2009 WL 904043, at *4 (D.N.J. Mar. 30, 2009). No error of law or fact has been shown in this ruling.
The district court applied the New York law of contracts, which recognizes provision of an effective date before or after the date of signing of a contract. See Viacom Int’l Inc. v. Tandem Prods., Inc., 368 F.Supp. 1264, 1270 (S.D.N.Y.1974) (“When a written contract provides that it shall be effective ‘as of an earlier date, it generally is retroactive to the earlier date.”); Faculty Ass’n of Suffolk Cmty. Coll. v. Public Emp’t Relations Bd., 125 A.D.2d 307, 508 N.Y.S.2d 591, 592 (1986) (recognizing retroactive effect of a successor agreement going back to the expiration date of the predecessor contract); Local Union 1567, Int’l Bhd. of Electrical Workers, AFL-CIO v. Orange and Rockland Utils., Inc., 104 A.D.2d 413, 478 N.Y.S.2d 937, 938 (1984) (retroactive effective date provided by collective bargaining agreement was binding, and applied to grievances that arose before the agreement was executed); Matthews v. Jeremiah Burns, Inc., 205 Misc. 1006, 129 N.Y.S.2d 841, 847 (Sup.Ct.1954) (amended agreement was retroactive to the date of the original amendment to which it referred, rather than taking effect only from the amendment’s date of execution); see also Mutual Life Ins. Co. of N.Y. v. Hurni Packing Co., 263 U.S. 167, 175-76, 44 S.Ct. 90, 68 L.Ed. 235 (1923) (applying New York law, “It was competent for the parties to agree that the effective date of the policy should be one prior to its actual execution or issue; and this, in our opinion, is what they did.”). Retroactivity also can serve to fill an unintended omission in an earlier agreement. See Local Union 1567, 478 N.Y.S.2d at 938; Matthews, 129 N.Y.S.2d at 847; Buffalo Police Benevolent Ass’n v. City of Buffalo, 114 Misc.2d 1091, 453 N.Y.S.2d 314, 317 (Sup.Ct.1982) (collective bargaining agreement was made retroactive to cover the period between the lapse of the previous contract and the execution of the new contract).
It is beyond cavil that parties to a contract can set the effective date of their agreement. The district court found, in accordance with New York law, that the June 28, 2006 Closing Date applied to all of the documents that referred to that Closing Date, and that the March 15, 2007 assignments were effective on the Effective Date stated therein.
My colleagues hold that despite the explicit language of the contract documents and the intent of the parties as stated in the contracts, the patents were not transferred on any of the transfer dates stated *1371 in the contracts. This court rejects the district court’s ruling that the March 15, 2007 reparative assignments were effective as of the Closing Date of June 28, 2006, although those patents were listed and sold in the closing documents. They even reject that the March 15, 2007 reparative assignments were effective on March 15, 2007. And they do not mention that even if there were some imperfection in ownership, it was corrected by the time the suit was filed.
C
The panel majority relies on assorted cases debating rights to future inventions. The question in this case is not whether or to whom an inventor assigned rights in possible unidentified future inventions, as in the “agree to assign” cases typified by Bd. Of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc., 583 F.3d 832, 841 (Fed.Cir.2009). This case relates to the law governing the commercial sale of existing patents, not the law of future rights to unknown inventions.
Patent conveyances are contracts, and the interpretation of sales contracts is a matter of state law. New York law permits contracts to take effect on a specified date, when such is the parties’ intent. Viacom, 368 F.Supp. at 1270; Faculty Ass’n of Suffolk Cmty. Coll., 508 N.Y.S.2d at 592; Local Union 1567, 478 N.Y.S.2d at 938; Matthews, 129 N.Y.S.2d at 847; see also Mutual Life, 263 U.S. at 175-76, 44 S.Ct. 90. It is incorrect for this court to refuse to apply the law that the parties have agreed to apply to these contracts. Indeed, my colleagues misdescribe New York contract law, ignoring the district court’s citation of authority. The district court correctly applied New York law in holding that the listed patents had been transferred as of June 28, 2006, the Closing Date of the transaction, and that Abraxis had title to the patents when suit was filed. No contrary meaning has been suggested for any of these contracts, and no conflicting law has been cited.
New York law recognizes that correct contract interpretation implements the intent of the contracting parties. E.g., Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) (“The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties’ intent.”). For the contracts before us, there is no uncertainty or indefiniteness or ambiguity. See id. (“Extrinsic evidence of the parties’ intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.”). The district court relied on all of the contract documents, and gave effect to the parties’ intent as stated in the Asset Purchase Agreement and all of the documents. E.g., Snug Harbor Square Venture v. Never Home Laundry, Inc., 252 A.D.2d 520, 675 N.Y.S.2d 365, 366 (1998) (“In construing a contract, the document must be read as a whole to determine the parties’ purpose and intent, giving a practical interpretation to the language employed so that the parties’ reasonable expectations are realized.”).
No evidence of a different intent was offered, nor any plausible theory that the parties intended anything other than transfer of the patents on the Closing Date. The March 15, 2007 documents state that they are effective as of June 28, 2006, “to enable the Transferee to further convey to Buyer that portion of the Transferred Assets” included in the Asset Purchase Agreement, “pursuant to which Transferee agreed to sell to Buyer and Buyer agreed to purchase from Transferee the Transferred Assets, all as more particularly set out in the Purchase Agreement.” The Asset Purchase Agreement states that the “Closing Date,” June 28, 2006, is the effective date for the transaction. As the *1372 district court correctly held, this date applies no less to the reparative assignments than it does to the other aspects of this commercial transaction. See Sunrise Med. HHG, Inc. v. AirSep Corp., 95 F.Supp.2d 348, 436-37 (W.D.Pa.2000) (“[A] nunc pro tunc assignment filed before the filing date of the action with an effective assignment date before the action does effect a valid transfer of rights sufficient to confer standing.”) (citing Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774, 779-80 (Fed.Cir.), amended on reh’g on different grounds, 104 F.3d 1296 (Fed.Cir.1996)).
By ignoring this clear expression of the parties’ intent, the majority has not given a “practical interpretation” to the agreements, and has failed to realize the parties’ intentions. Snug Harbor, supra. The majority has done quite the opposite, en-grafting a meaning that no party could reasonably or possibly have intended, and holding that despite all of these documents, ownership of these three patents was not transferred until the November 12, 2007 “confirmation” of ownership “since no later than June 28, 2006.”
D
The panel majority states that this court has its own law, derived not from state law but from federal patent policy, in order to prevent litigants from filing suit before they have achieved ownership of the assets they seek to litigate, citing Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1093 (Fed.Cir.1998). In Enzo the court held that an exclusive license executed after a non-exclusive licensee filed suit did not establish standing at the time of filing, even if the exclusive license is stated to be retroactive. In Enzo the court found that there was no indication or evidence of any intention that the license would be exclusive before the suit was filed, despite an alleged oral agreement; thus the court held that the proposed retroactivity of exclusivity did not track an actual intent at the earlier time. Id. at 1093 (noting that no written license agreement existed at the time suit was filed). In sharp contrast, for the case at bar the Asset Purchase Agreement and the Intellectual Property Assignment Agreement state the sale of all rights to these patents. The parties intended that these patents would be included in the sale, and they were sold on the Closing Date of June 28, 2006. The reparative assignment documents on March 15, 2007 reflected that which was intended. See Mas-Hamilton Grp. v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed.Cir.1998) (distinguishing patentee’s nunc pro tunc agreement correcting an earlier writing as of the earlier date, from Enzo, where a post-filing assignment could not retroactively cure the absence of any written presuit agreement). Enzo does not affect the district court’s ruling under New York law, for here there were explicit written presuit sales and transfer agreements.
As mentioned ante, the panel majority relies on cases interpreting “promise to assign” disputes, stating that these cases mean that the district court erred in implementing the Further Assurances provision of the June 28, 2006 Intellectual Property Assignment Agreement. Maj. Op. at 1364-65. However, the “promise to assign” cases do not invalidate, and indeed have no relation to this Further Assurances provision, for they relate to the special situation of ownership of future inventions not made at the time of the “promise to assign.” See, e.g., Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1576 (Fed.Cir.1991) (disputing rights to an invention that may have been conceived during a consulting project). Issues arising from employment contracts have arisen on a variety of facts, but do not relate even remotely to this ease. The majority’s reliance on this class of cases is obscure.
*1373 The issue here is not an expectant interest in a future invention, but the effect under New York law of the explicit transfer of existing patents, as in the Intellectual Property Assignment Agreement. Indeed, the cases on which the majority relies do not support its thesis. For example, in Stanford v. Roche, swpra, the court held that the language “do hereby assign” effected a present assignment, 583 F.3d at 842, although the invention and patent did not exist when the contract was made. Here, in contrast, all of the patents at issue were listed in the Asset Purchase Agreement. And even if this court were to conclude that the transfer required separate remedial assignment documents, these documents were obtained when this suit was filed. Thus standing is established even on the majority’s position.
In addition, as a matter of contract interpretation, Federal Circuit precedent is contrary to the position of the panel majority. For example, in Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed.Cir.2000) the court explained that the “substance of what was granted” governs the interpretation of contracts, quoting Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed.Cir.1991). The court in Speedplay authorized correcting an error in the patent number in view of the clear intent of the parties, whereby the correction was held retroactive to the date of the contract. As another example, in Viskase Corp. v. American National Can Co., 261 F.3d 1316, 1328-29 (Fed.Cir.2001), this court held that a patent’s incorrect naming of inventors did not impair the patent owner’s rights and thus did not undermine standing to sue. These rulings, like New York law and all contract law, implement contractual intent.
No evidence of any conflicting intent or purpose has been offered as to the Asset Purchase Agreement and any of the related contracts. All parties to the transaction agree that the patents were sold and transferred to Abraxis as of the Effective Date stated in the agreements. This court’s ruling that the transaction was legally void is negated by all precedent, is contrary to New York law, and is not within any federal exception to state law. The district court correctly ruled that Abraxis had standing to sue when this case was filed. With all respect to my colleagues on this panel, I must dissent from their ruling and their reasoning.[1]

. Although the court dismisses the case for lack of standing, my colleagues nonetheless also offer remarks that appear to be directed to the merits. However, if there was no standing in the district court, the merits decision is not before this panel for review.